# STATE OF MICHIGAN

# COURT OF APPEALS

CITY OF ROSEVILLE,

       Plaintiff-Appellee,

v

JOHN MUSTA, JR.,

       Defendant-Appellant,

and

KIM C. LOFFREDO and FIRST FEDERAL OF
MICHIGAN, also known as CHARTER ONE
BANK, FSB,

       Defendants.

UNPUBLISHED
October 16, 2018

No. 338535
Macomb Circuit Court
LC No. 2014-004611-CC

Before: JANSEN, P.J., and METER and STEPHENS, JJ.

PER CURIAM.

Defendant John Musta, Jr. (hereinafter "defendant"), proceeding *in propria persona*, appeals as of right the trial court's order, entered after a bench trial, declaring defendant's residential property to be a public nuisance and ordering that the nuisance be abated by the demolition of the house, garage, and fence on the property. We affirm.

Defendant owns residential property at 19030 Common Road in Roseville. The property contains a single-family home with a garage and a privacy fence. Plaintiff has issued notices to correct various code violations on the property dating back to 1999. In 2011, the property was designated as not appropriate for occupancy, but defendant and plaintiff reached an agreement whereby defendant agreed to obtain financing to correct the code violations and plaintiff agreed to remove the non-occupancy designation. Defendant failed to follow through and make the necessary repairs. In November 2014, plaintiff's city council passed a resolution declaring the property a public nuisance and authorizing its abatement. Plaintiff then filed this action to have the property declared a nuisance and to obtain an order for the abatement of the code violations. In April 2015, an inspection by plaintiff's building director, Glenn Sexton, revealed numerous conditions and code violations that required correction, both inside and outside the house and the garage. The trial court conducted a bench trial in November 2016 and personally inspected the

-1-

property in March 2017. Thereafter, in April 2017, the court issued a written opinion and order declaring the property a public nuisance and ordering abatement of the nuisance by the demolition of the house, garage, and fence on the property.

Defendant now argues that the trial court erred by finding that the property was a public nuisance and by ordering the abatement measures.[1] We disagree. Nuisance-abatement proceedings are generally equitable in nature. MCL 600.2940(5); *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 270; 761 NW2d 761 (2008). While circuit courts have broad equitable authority to abate nuisances pursuant to MCL 600.2940, the court must first determine that an actual nuisance exists. *Ypsilanti Twp*, 281 Mich App at 275-276. We review de novo the circuit court's equitable decision, but review for clear error the court's findings of fact supporting its decision. *Id*. at 270.

In *Ypsilanti Twp*, *id*. at 276, this Court defined a public nuisance:

> "The word 'nuisance' has been variously defined and is so comprehensive that its existence must be determined from the facts and circumstances of each case." *Ebel v Saginaw Co Bd of Rd Comm'rs*, 386 Mich 598, 606; 194 NW2d 365 (1972). However, at its core, "[p]ublic nuisance includes interference with the public health, the public safety, the public morals, the public peace, the public comfort, and the public convenience in travel." *Bronson* [*v Oscoda Twp*], 188 Mich App [679], 684[; 470 NW2d 688 (1991)].
>
>> The essential element of a nuisance is a wrongful, continuing, impending danger to the lives or health of the public, or to the legitimate property or personal rights of private persons peculiarly subject to the danger. A condition that is so threatening as to constitute an impending danger to the public welfare is a nuisance. [19 Michigan Civil Jurisprudence, Nuisances, § 1, pp 62-63.]
>
> See also *Garfield Twp v Young*, 348 Mich 337, 342; 82 NW2d 876 (1957) (listing cases describing various types of public nuisances).

The trial court found that the house, garage, and fence on defendant's property were in such a serious state of disrepair that they were a safety hazard and constituted a public nuisance. Although the court agreed that there were many minor or cosmetic code violations, its decision was not based on those conditions, but rather on more significant problems.

---

[1] We note that defendant has submitted many documents that were not presented in the trial court. Our review is limited to the trial court record, and a party may not expand the record on appeal. *The Meisner Law Group, PC v Weston Downs Condo Ass'n*, 321 Mich App 702, 724-725; 909 NW2d 890 (2017), lv pending. Accordingly, we decline to consider the evidentiary materials that were not presented in the trial court.

According to Sexton, the roof of the house was in such a state of disrepair that water and animals were able to freely enter the inside. Defendant does not dispute this, but argues that he should be given a chance to repair the roof and claims that he already has contractors that are prepared to repair or replace the roof. At trial, defendant did not offer any evidence of his contacts with contractors beyond his own testimony that he planned to hire a contractor to repair the roof.[2] Moreover, although the roof was identified as a significant problem, the evidence showed that there were other significant problems with the home that required repair before it could be considered safe. The condition of the roof had caused damage to the ceilings, walls, and floors. The court noted in its findings that "[t]he interior of the house almost defies description." Defendant attempts to attribute the water damage to a waterbed leak, but the trial court visited the property in March 2017 and found that there was water damage to virtually all of the ceilings and walls and that mold was evident in many areas. The court found that the entire interior of the home would have to be gutted and the structural components inspected before the house could be rebuilt. The court did not clearly err by finding that defendant's plan to merely repair and repaint the drywall was "entirely unrealistic."

The court also found that there were significant plumbing issues that needed to be addressed, including replacement of lead pipes. Defendant admitted the lead issue in his testimony. Defendant did not present evidence of any plan to correct this condition within a reasonable time.

Upon the court's inspection, it was also apparent that upgrades to the electrical and heating systems were necessary because neither appeared to be functioning when the court viewed the property. The court pointed out that, due to water infiltration, the electrical system presented risks of electrocution, fire, and structural failure. The court noted that because the furnace was in disrepair on the date the court visited the property, defendant attempted to heat the house with a fire in the fireplace, but the chimney flue did not properly exhaust combustion gases. In addition, the chimney was not structurally sound and was at risk of toppling over. Indeed, the court observed that the chimney had partially collapsed and that it needed to be entirely replaced. Defendant did not address how he intended to have that work performed or how he would do the work himself.

The basement walls had cracks and it was evident that water had infiltrated the basement, causing the presence of mold, stains, and smells. Although defendant has offered quotes from foundation-repair or waterproofing companies, he did not present that evidence at the time of trial. Therefore, we decline to consider it.

The house also lacked windows that properly opened and closed to protect against the weather, provide security, and allow for egress in an emergency. Replacing the windows would involve another significant expense, and defendant never addressed how he intended to pay for this.

---

[2] He testified that he intended to complete the remaining repairs himself.

As for the garage, which the trial court noted was "stuffed to the gills," the walls were bowed and tilting, the roof sagged and the shingles were in poor condition, and the garage door could not close. Further, an addition at the back of the garage had rotted and was falling in on itself. The court described an exterior fence as unsightly, but further found that it offered neither privacy nor security because pickets were loose, rotted, or missing. Again, defendant failed to explain how he intended to cover the cost of fixing the garage and fence.

Defendant has not shown that any of the trial court's findings regarding the condition of the property were clearly erroneous. They were supported by Sexton's testimony, as well as the court's observations during its personal visit to the property. Defendant also failed to show that the problems with the property were reasonably likely to be fixed or resolved in a timely or economically feasible manner. Although defendant had made some repairs, and some code violations were only minor, he had not addressed the more serious problems with the property, and the extent of the structural and water damage was so severe that, according to Sexton, it would not be economically feasible to rehabilitate the property. Moreover, the problems with the house had existed, and worsened, for many years. Significantly, testimony indicated that there had been problems with the property dating back to 1999. Defendant reached an agreement with the city to address the code violations in 2011, but he failed to do so. Defendant had notice of the majority of the current conditions in April 2015, when Sexton completed his inspection of the property. Since then, little progress was made to rehabilitate the property, and none of the significant code violations had been corrected.

In his brief, defendant asserts that neighbors have not complained about his house and claims that he has obtained estimates from real-estate professionals indicating that the property is appropriate for rehabilitation. Again, however, defendant did not present any of that evidence at trial.

Defendant argues that plaintiff and Sexton were biased against him and motivated by a personal desire to obtain his property. He claims that Sexton interfered with his efforts to obtain a new roof through a church group. At trial, Sexton testified that he merely informed the church group that defendant was not then occupying the property and advised it of all of the other work that was needed to make the home habitable, after which the group declined to provide financial assistance to defendant. Defendant has not demonstrated that Sexton acted improperly or was motivated by bad faith in advising the church group about the condition of defendant's house. Defendant also failed to present any credible evidence that plaintiff was motivated to have the property declared a nuisance so that it could obtain the property for its own use. Indeed, Sexton testified that he had afforded defendant more time to correct the code violations than he had with any other property owner. Moreover, even if the structures on the property were demolished to abate the nuisance, defendant would remain the owner of the property. Defendant also failed to show that the house should be protected from demolition because of its historical status, notwithstanding its condition as a public nuisance.

Defendant also argues that he was not allowed to properly defend his case because the trial court unduly limited his examination of Sexton and restricted him from offering evidence. The record does not support these claims. Before the start of trial, defendant informed the court that his attorney failed to appear and complained that he had not had sufficient time to review plaintiff's "notebook." However, defendant never requested an adjournment, and the trial court

provided defendant with an opportunity to review plaintiff's materials before cross-examining Sexton. Thereafter, defendant did not claim that he did not have sufficient opportunity to prepare for cross-examination, and the record discloses that he was provided with a full opportunity to cross-examine the witness. After plaintiff rested, defendant announced that he did not have any witnesses, but would like to make a statement. The court allowed defendant to "tell the [c]ourt what you want," and the court intervened during plaintiff's testimony[3] to ask various questions. After defendant was finished with his statements, the court allowed plaintiff to cross-examine him. There is no indication that the court prevented defendant from offering any information he believed was relevant to his case. Thus, defendant has not shown that he was deprived of his right to present a defense.

In sum, it is apparent from the record that the code violations with defendant's property have persisted for several years. Although defendant presented plans for correcting some of the violations, he had no realistic plan for resolving most of them, particularly the more serious ones. Moreover, he had been given multiple opportunities to correct the violations in the past, but he had not done so, causing the property to become so severely damaged that it was no longer structurally sound or habitable, and the problems had become so extensive and pervasive that it was no longer economically feasible to rehabilitate the property. Under the circumstances, the trial court did not clearly err in finding that the property was a public nuisance, and it did not err in ordering that the nuisance be abated by the demolition of the house, garage, and fence.

Affirmed.

/s/ Kathleen Jansen
/s/ Patrick M. Meter
/s/ Cynthia Diane Stephens

---

[3] Plaintiff was sworn in as a witness.